Jennifer L. **GRAY**, Plaintiff,

v.

**AMERITECH CORPORATION,**
Defendant.

No. 95 C 556.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 22, 1996.

Gregory E. Kulis, Kathleen T. Coyne, Gregory E. Kulis and Associates, Chicago, IL, for Plaintiff.

Deborah Anna Golden, Benjamin Ghess, Ameritech Corporation, Chicago, IL, Todd L. Shivers, Illinois Bell Telephone Company, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Jennifer Gray ("Gray") has sued Ameritech Corporation ("Ameritech"), asserting that Ameritech violated the Americans with Disabilities Act ("ADA," 42 U.S.C. §§ 12101–12117 [1]) by discriminating against her because of her skin condition. Gray contends that Ameritech, through the actions of Gray's supervisor Marj Scott ("Scott"), created a work environment that was so hostile that Gray was forced to quit her job as an operator—a claimed constructive discharge.

Ameritech now moves for summary judgment under Fed.R.Civ.P. ("Rule") 56. Both sides have complied with this District Court's General Rule ("GR") 12(M) and 12(N),[2] and the motion is fully briefed and ready for decision. For the reasons set out in this memorandum opinion and order, Ameritech's motion is granted and this action is dismissed.

### Summary Judgment Standards

Under familiar Rule 56 principles Ameritech has the burden of establishing both the lack of a genuine issue of material fact and that it is entitled to a judgment as a matter of law (*Celotex v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). Summary judgment is appropriate if the record reveals that no reasonable jury could find for Gray on her claim. For that purpose the evidence must be "construed as favorably to [Gray] as reason and the record permit" (*Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 272 (7th Cir.1996)). Thus this Court will draw inferences in the light most favorable to nonmovant Gray, but it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable" (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). What follows in the *Facts* section, then, is a factual statement drawn from the parties' submissions, with any differences between them resolved in Gray's favor.[3]

### Facts

Gray began working for Ameritech in 1989 as a directory assistance operator (A. 12(M) ¶ 44). That job entailed responding to customer calls by locating business and residential telephone numbers, addresses and zip codes, and sometimes handling "911" emergency calls (*id.*). In November 1993 Gray moved from Ameritech's Lake Shore office to its Canal Street office, at which time Scott became Gray's supervisor (*id.* ¶ 45). Gray's allegations are limited to actions taken against her by Scott during Gray's tenure at the Canal Street office—between November 1993 and August 1994 (Gray Dep. 55).

---

1. Further ADA citations will take the form "Section—," referring to the Title 42 numbering rather than ADA's internal numbering. Pertinent regulations from 29 C.F.R. are cited "Reg. § —."

2. To facilitate the identification of factual disputes, or to demonstrate the absence of any such disputes, this District Court has adopted those portions of GR 12, which require the parties to set out their respective factual positions together with references to the record.

3. Because nonmovant Gray's version of the facts must now be take as true, this opinion will not use hedging phrases such as "Gray contends" or "Gray asserts" when setting out the factual background. Nor will any effort be made to point out all of the frequent disagreements in the parties' versions of the facts. As for the sources of the factual account, "G." will stand for Gray and "A." for Ameritech in identifying their respective statements under GR 12(M) ("A. 12(M) ¶ —") and 12(N) ("G. 12(N) ¶ —") and their exhibits and memoranda. Where Gray has explicitly or implicitly admitted a portion of Ameritech's GR 12(M) statement, only "A. 12(M) ¶ —" will be cited. Whenever possible this opinion will cite only to the GR 12(M) and 12(N) statements, not to the underlying record references.

In 1990 Gray had begun suffering from a skin condition known as psoriasis (A. 12(M) ¶ 24), defined in *Stedman's Medical Dictionary* 1163 (5th Unabridged L.Ed.1982) as:

a condition characterized by the eruption of circumscribed, discrete and confluent, reddish, silvery-scaled maculopapules; the lesions occur preeminently on the elbows, knees, scalp, and trunk....

Psoriasis is not contagious (G. 12(N) ¶ 3).

During the first outbreak of the condition in 1990 (when she was working at the Lake Shore office) Gray had "white sores all over [her] face and body" that sometimes would "bust and bleed" (Gray Dep. 41–42). Gray's skin would also flake off, and the dryness of her skin would make her itchy and uncomfortable. Gray has characterized the initial outbreak at the Lake Shore office as "much worse" than it was later at the Canal Street office, when the discriminatory treatment occurred (Gray Dep. 37–38). Gray went on disability leave from June through November 1990,[4] during which time doctor treated the psoriasis with pills, ointments and ultraviolet radiation (Gray Dep. 43). By the time that Gray returned to work in November 1990 her condition had cleared up somewhat, although she continued to take pills and use ointments to keep it controlled (Gray Dep. 49).

Although Gray has had psoriasis continually since that first outbreak in 1990, she has suffered intermittent outbreaks during which her condition was worse than at other times (Gray Dep. 55). Unfortunately the record is unclear as to exactly how the psoriasis manifested itself during the period at issue in this lawsuit—November 1993 through August 1994. In addition to the itching and dry skin that always accompanied the outbreaks, while Gray worked at the Canal Street office her skin was flaking off, she was losing some hair, and the medical treatment that she was receiving was causing her skin to become darker (Greer Dep. 15, 26, 28, 30; McClaurin Dep. 11, 57–58). During that 10–month period the condition fluctuated in severity— sometimes the psoriasis was apparent because it made Gray's skin "scaly" and "not very pleasing to the eye" (Carey Dep. 12;

see also McClaurin Dep. 11), while at other times it was "hardly noticeable" (Carey Dep. 12; Watson Dep. 16). Gray controlled the psoriasis to some degree with medication, including pills that minimized the itching and lotion that cleared up the blemishes (A. 12(M) ¶ 27). One side effect of the medication was that it caused Gray to feel drowsy (Gray Dep. 108). Another tangible effect of the psoriasis itself was that Gray had to take a high number of "specials"—non-scheduled breaks—to use the bathroom to scratch her head (to relieve the itching) and to apply lipstick (to relieve dry lips) (Caver Dep. 61–62).

At the time that Gray began working at the Canal Street office she was in the midst of disciplinary steps for poor job performance and poor attendance (A. 12(M) ¶ 51). In December 1993 Scott and Gray discussed Gray's performance and attendance problems, and Scott warned Gray that she would be subject to additional discipline—including possible dismissal—if her performance and attendance did not improve (A. 12(M) ¶ 52).

Gray says that from that point forward Scott did much more than just monitor Gray's performance: She claims that Scott constantly harassed her because of the psoriasis, ultimately making the work environment so hostile that it caused her to quit. Gray bases her hostile environment theory on ten categories of actions or patterns of behavior, described in these terms at G.Mem. 11:

(a) Marj Scott forced the Plaintiff to go on disability leave in April of 1994;

(b) Marj Scott followed her to the bathroom, or would have someone else follow her then questioned her as to what she was doing in the bathroom;

(c) Marj Scott reprimanded the Plaintiff for attending to her skin condition by using a comb to scratch her head and/or apply medication at her work station and while on a bathroom special even after the Plaintiff informed her of the reasons she engaged in such acts;

---

4. Gray notes that she was on disability leave— and indeed spent a period of time in the hospital—because of tumors in her breast, not just because of psoriasis (Gray Dep. 41–48).

(d) Marj Scott requested the Plaintiff sit in a [sic] the same seat every day and referred Plaintiff to seats which were rarely occupied by other employees, while other employees could sit wherever they wanted;

(e) Marj Scott referred to Plaintiff's skin condition as contagious when she would talk alone with the Plaintiff and while in front of Plaintiff's co-workers;

(f) Marj Scott would make faces reflecting "repulsion" in Plaintiff's presence and behind her back;

(g) Marj Scott would have numerous conversations with the Plaintiff about her skin condition;

(h) Scott would constantly stare at the Plaintiff;

(i) Scott would make other derogatory remarks regarding Plaintiff's skin condition, including telling her that she is "flaking" all over the place; and,

(j) Marj Scott would take more observations of the Plaintiff than other employees and pull her from the board more than other employees to "talk".

Despite what Gray perceived as ongoing and pervasive harassment by Scott because of Gray's skin condition, she did not complain directly to Ameritech management, either in person or in writing (A. 12(M) ¶ 10, 11). Nor did she file any formal grievance, either with Ameritech's internal Equal Employment Opportunity ("EEO") office or with the Equal Employment Opportunity Commission ("EEOC") (A. 12(M) ¶¶ 10, 14). Instead Gray spoke to Vivian Caver ("Caver"), her union steward, with the expectation that Caver would relay Gray's complaints to a higher-up in Ameritech management (Gray Dep. 59–60). Gray never filed a formal union grievance about Scott's harassment (Caver Dep. 88), and only on one occasion (discussed later) did Caver carry Gray's informal complaints about Scott to anyone in Ameritech's management (Caver Dep. 116–21).

On July 25, 1994 Gray notified Ameritech that she would be accepting the company's pension plan enhancement program[5] and leaving the company effective August 26, 1994 (A. 12(M) ¶ 12). Gray's first and only direct complaint to Ameritech management came two weeks *after* her last day at Ameritech in the form of a September 7, 1994 letter to David Sons ("Sons"), the office manager of the Canal Street office (A.Ex. 8). After leaving Ameritech Gray worked for Rush–Presbyterian St. Luke's Medical Center from October 1994 to November 1994, and she has been employed by the United States Postal Service from December 1994 to the present.

On October 4, 1994 Gray filed an employment discrimination charge with EEOC, and EEOC issued a right-to-sue letter on October 31, 1994. This suit followed on January 27, 1995.

### Positions of the Parties

Gray claims that Ameritech, through Scott's actions, violated ADA by creating a hostile work environment that ultimately forced her to quit her job. Ameritech sets out three grounds for prevailing via summary judgment:

1. It claims that Gray's psoriasis is not a "disability" as the term is defined for ADA purposes, so that Gray is not entitled to relief under ADA.

2. It also contends that the Canal Street office was not a sufficiently hostile environment to give rise to liability on that theory.

3. Finally it asserts that Gray left Ameritech's employ under her own volition because of the pension plan enhancement employment and not because of the work environment, thereby negating the constructive discharge element of Gray's claim.

This opinion will consider each of these arguments in turn.

### Psoriasis as a Disability Under ADA

ADA's Section 12112(a) reads:

5. Under the program Gray received three years added to her age and service, a lump sum payment, six months' medical coverage, educational assistance and financial planning assistance (A.

12(M) ¶ 18). Many individuals between the ages of 20 and 40 left Ameritech's employ by taking part in the pension plan enhancement program (*id.* ¶ 17).

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

Under ADA a "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires" (Section 12111(8)). To recover under ADA a plaintiff must show (*White v. York Int'l Corp.*, 45 F.3d 357, 360–61 (10th Cir.1995)):

1. she is a disabled person within ADA's definition of that concept;

2. she is also "qualified" in the sense defined in Section 12111(8); and

3. the employer terminated her because of her disability.

Of course the first of those three requirements presents a threshold question—if a person is not "disabled" there is no need to proceed further with the inquiry (*Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1454 (7th Cir.1995)). On that score Reg. § 1630.2(g) explains:

*Disability* means, with respect to an individual—

(1) A physical or mental impairment that substantially limits one or more of the major life activities of such an individual;

(2) A record of such an impairment; or

(3) Being regarded as having such an impairment.

Although she urges that she is disabled under all three of those criteria, Gray spends the bulk of her efforts trying to position herself in the first category. In that regard she contends that she is disabled in that psoriasis affects her "entire lifestyle" because it "has altered everything from her morning preparations to her grooming rituals," dictates her wardrobe and more generally makes her appearance "not a pleasant sight" (G.Mem. 3–4). She also claims that it affects her ability to socialize (*id.* 6). Moreover she asserts that psoriasis "substantially limited her job responsibilities while employed at Defendant Ameritech and poses a significant restriction on her ability to work in general" (*id.* 7). Those things, Gray says, qualify as limiting "one or more major life activities" as defined by Reg. § 1630.2(i):

*Major Life Activities* means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

There is, however, one significant obstacle in Gray's path: her own deposition testimony about how psoriasis affects her life. Here is a portion of Gray's deposition, which because of its relevance deserves to be quoted at length (Gray Dep. 153–55):

Q: In terms of you having psoriasis, did that impact you doing the things that you normally did on a daily basis?

A: No, it didn't.

Q: Did it change the way that you came to work or how you got to work?

A: No.

Q: Did it change the activities that you would do after work?

A: No.

Q: So basically having the psoriasis did not change your life style?

A: No.

Q: Now, in terms of the job itself in terms of the operator's position, you are testifying that other than basically being somewhat drowsy from the medication, there was no other impact on your job as it related to your condition?

A: It affected me a little mentally.

Q: When you say affected you, the psoriasis affected you a little mentally?

A: Just knowing that I had it.

Q: And in terms of—First of all, I am just focusing on the job itself.

A: Okay, I am sorry.

Q: In terms of the job, how did the psoriasis impact you in terms of doing your job?

The testimony I understand from earlier today that it only impacted you, and that was because of the medication, by being somewhat slower at the position, right?

A: Yes.

Q: And the psoriasis itself didn't cause that, but it was the medication that you were taking for the psoriasis, correct?

A: Yes.

Q: Is that correct?

A: Yes.

Q: So the psoriasis itself did not impact your ability to perform the operator's job?

A: No, it did not.

As if that were not enough to blow her case right out of the water, a bit later in her deposition the following exchange took place as Ameritech's counsel asked Gray about the allegations in her Complaint ¶ 9 [6] (Gray Dep. 160):

Q: Take a look at paragraph 9, and it states in paragraph 9 that the condition substantially limited you physically and mentally in terms of your ability to function in everyday-life activities.

Did the condition limit you physically and mentally substantially?

A: No.

Q: And it did not affect your ability to function in terms of everyday-life activities?

A: No.

These two exchanges would seem to put the kibosh on Gray's claim. Indeed the latter excerpt casts a Rule 11 shadow, for there Gray expressly disavows an averment made in the Complaint.

But Gray and her attorney were not turned back so easily. After the deposition recessed and was then resumed several days later, Gray—now under examination by her own attorney—recanted those answers that would have sabotaged her case (Gray Dep. 272–74):

Q: Do you recall earlier in the deposition when Mr. Ghess [Ameritech's counsel] asked you if your condition of psoriasis limited you physically or mentally in your everyday-life activities?

A: Yes.

Q: Do you recall your response to that answer [sic]?

A: I believe I told him no physically, and mentally I said it affected me because I knew I had it.

Q: Now, does this condition affect you physically?

A: Yes, it does.

Q: And how does it affect you physically?

A: Because it distorts my appearance.

Q: How does it distort your appearance?

A: It changes my facial appearance and it changes my body appearance. It distorts my appearance.

Q: How does that limit your everyday-life activities?

A: It cuts out my social life. It keeps me from doing a lot of things. It keeps me from even going to family functions and things like that. Just physically it has distorted me.

Q: Does it interfere with your life at all?

MR. GHESS: I am going to object. The question has been asked and answered.

BY MS. COYNE:

Q: Go ahead and answer it. Does it interfere with your life at all?

A: Socially.

Gray's revision of her own initial deposition testimony has continued in the affidavit that she submitted with her response to Ameritech's motion for summary judgment. There she said (Gray Aff. ¶ 10):

Although I like to think and act as if my skin condition has not had an impact on my life, the fact remains that as a result of the psoriasis my life has changed significantly.

She then went on to describe how psoriasis affects her "morning ritual" (*id.* ¶ 11), her wardrobe (*id.* ¶ 12), her personal and social

---

**6.** Here is that paragraph:

Plaintiff, JENNIFER L. GRAY, has been diagnosed with a chronic skin condition called psoriasis. The Plaintiff's condition substantially limited the Plaintiff, physically and mentally, in her ability to function in every day life activities.

life (*id.* ¶¶ 14–16) and her work performance (*id.* ¶ 19).

■ It is well settled that "parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions" (*Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir.1996)). If the only issue before this Court were a comparison between Gray's affidavit and the statements she made on direct examination by Ameritech's lawyer (the first two passages quoted earlier), this would be a slam-dunk: Clearly Gray's affidavit conflicts with her prior sworn testimony, and so it should be disregarded (*Russell v. Acme–Evans*, 51 F.3d 64, 67–68 (7th Cir.1995)), thus leaving Gray without any evidence that she is actually disabled.

But then there is the later deposition exchange between Gray and her own lawyer, also quoted in this opinion. There Gray's attorney repeated a question that Ameritech counsel had asked earlier (triggering an "asked and answered" objection, Gray Dep. 273), but this time Gray gave a different answer, one that could arguably support the notion that she is disabled for ADA purposes. So what we have is Gray making two directly inconsistent statements at different points in her deposition, and then fortifying the revised testimony with an affidavit.[7] What is to be made of all that?

Gray is of course entitled to inferences to be drawn in her favor, but only if those inferences are reasonable. And although the numerous decisions of our Court of Appeals that are epitomized by *Russell* and *Bank of Illinois* are not precisely on point, their thrust militates strongly against Gray. It is clear to this Court that an inference in her favor on this score would not be reasonable. It is not simply that she has given directly contradictory answers to the same question. More significantly, the later answer—the one that might potentially save the day for Gray—came after a nine-day break in the deposition and was prompted by Gray's attorney re-asking a question that had already been asked and answered in a way that sabotaged her claim.

In that situation this Court is not obligated to play ostrich. Unless one's head is buried in the sand, it is painfully obvious that Gray received some "education" in the interim. Gray's second answer must be viewed as the equivalent of an affidavit that conflicts with earlier sworn testimony in a thinly-veiled effort to save her claim from summary judgment. This Court is entitled to, and will, disregard that later deposition testimony just as it would such a later affidavit (see *Russell*, 51 F.3d at 67–68). Of course that applies a fortiori to Gray's actual affidavit, which is clearly inconsistent with her earlier deposition testimony. As a result Gray can point to nothing in the record that may be credited in support of her assertion that she had a "physical or mental impairment that substantially limits one or more of [her] major life activities." [8]

■ Gray next makes a one-paragraph argument that she "has a record of such impairment" (the Regulation's second alternative definition of "disability") that brings her

---

7. It should be noted that *at best* only part of Gray's affidavit could survive under the test set out in *Russell*, 51 F.3d at 67–68. For example, the portions of Gray's affidavit in which she outlines in detail how psoriasis affects her morning routines (Gray Aff. ¶ 11) and her wardrobe (*id.* ¶ 12) are directly contrary to her deposition testimony that psoriasis does not affect her everyday life activities (Gray Dep. 153–55, 160). And nothing in the revisionist portion of her deposition testimony could be read as even arguably consistent with those portions of the affidavit.

8. Gray is not saved by any of the exceptions to the rule set out in *Russell* and other cases. There was nothing confusing about the questions posed by Ameritech's counsel, and so Gray's later deposition testimony and affidavit cannot be said to be clearing up a confused answer (*Russell*, 51 F.3d at 68). Nor can Gray bootstrap herself by her later assertion that she has trouble admitting to herself how psoriasis affects her, and that is why she denied in Part I of the deposition that the condition had any effect on her life (see Gray Aff. ¶ 10, stating "Although I like to think and act as if my skin condition has not had an impact on my life, the fact remains that as a result of my psoriasis my life has changed significantly."). Whatever the validity of that sort of sidewalk psychology, it is not the kind of "plausible explanation for the discrepancy" that can validate Gray's later deposition testimony or her affidavit as against her earlier sworn admissions.

within ADA's purview. That is so, she says, because her "disability leaves as well as her ongoing need to receive medication and radiation treatments, establishes the severity of her affliction and a record of impairment" (P.Mem. 8).

Reg. § 1630.2(k) instructs that "has a record of such impairment" means that someone:

> has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.

In the context of that definition, Gray's proffered evidence really aims at the wrong target—the fact that she was treated for, and was even given leave because of, her psoriasis does not equate to her psoriasis being "disabling" as defined under ADA. For that purpose Gray must show not just that she has a history of an impairment, but that she has a history of an impairment that substantially limits one or more major life activities. Because she has already lost on the latter issue, she has also failed to meet her burden on this second argument.

■ Gray finally urges that she "is regarded as having such an impairment" (the third alternative definition of "disability"). According to Reg. § 1630.2(l) that means:

> (1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;
>
> (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
>
> (3) Has none of the impairments defined in paragraph (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.

Gray contends that Reg. § 1630.2(l)(1) and (2) apply to her. Her central argument is that the facts that Ameritech allowed Gray to take "disability leave" and that her medical file referred to her skin condition as a "disability" are evidence that Ameritech treated Gray as if she were substantially limited in major life activities. She also asserts that Scott's belief that Gray's condition was conta-

gious and Scott's insistence that Gray take disability leave are evidence that she was regarded as being disabled.

Insofar as Gray bases her argument on Ameritech's use of the word "disability" in reference to Gray's medical leave and in Gray's records, Gray wrongly assumes that "disability" can be neatly transferred from context to context without regard to how the term is defined. Contrast, for example, the Reg. § 1630.2(g) definition of disability with the Social Security Act's provision (42 U.S.C. § 416(i)), which defines "disability" in an entirely different manner for purposes of disability insurance benefits. Clearly "disability" as used in ADA is a term of art, and thus the fact that someone at Ameritech may have employed it in a more generic sense in Gray's medical records really means nothing.

But Gray is more persuasive in pointing to Scott's treatment of her as presenting a question of fact as to whether she comes within the "regarded as having a disability" definition set out in Reg. § 1630.2(l)(1). Appendix to 29 CFR Pt. 1630, titled "Interpretive Guidance on Title I of the Americans with Disabilities Act," expounds on what is meant by Reg. § 1630.2(l)(1):

> An individual satisfies the first part of this definition if the individual has an impairment that is not substantially limiting, but the covered entity perceives the impairment as being substantially limiting. For example, suppose an employee has controlled high blood pressure that is not substantially limiting. If an employer reassigns the individual to less strenuous work because of unsubstantiated fears that the individual will suffer a heart attack if her or she continues to perform strenuous work, the employer would be regarding the individual as disabled.

Although it is a close question, a reasonable jury could conceivably find that Scott treated Gray as if she were disabled. At least for some period of time Scott mistakenly believed that Gray was "contagious" (Scott Dep. 58–59; Caver Dep. 35–37, 71). Because of that belief, and because Gray's flaking skin was making a mess at the terminal where she sat, Scott asked Gray if she wanted to sit at the same terminal each day, something

that other employees were not asked to do (Gray Dep. 61, 181–83). There also is evidence that Scott asked Gray to take a medical leave until her skin condition cleared up (Gray Dep. 229–30). From those instances a reasonable jury could draw the inference that Scott treated Gray—like the hypothetical person with controlled high blood pressure—as if she were disabled, even though Gray has failed to show that she actually *was* disabled within ADA's usage. That is enough for Gray to survive summary judgment at the first hurdle.

But that is a short-lived victory—or more accurately, no victory at all. Even though a reasonable jury could find that Scott regarded Gray as disabled so as to bring ADA into play, two major flaws (each of them being independently fatal to Gray) still doom Gray's case. Those will be dealt with in the ensuing sections of this opinion.

### Hostile Environment

■ To begin with, Gray has offered nothing to show that Ameritech should be held responsible for any violations of ADA that might have occurred. Presumably a hostile environment theory (the concept on which Gray seeks to rely) is available under ADA as it is in Title VII cases.[9] To prevail on such a theory Gray would have to prove[10] that Scott's "conduct ha[d] the purpose or effect of unreasonably interfering with [Gray's] work performance or creating an intimidating, hostile, or offensive working environment" (*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986)).

■ It is unnecessary to determine here whether a reasonable factfinder could consider that a hostile environment existed, because even if that were so there is nothing in the record to impute Scott's actions to the only defendant in this case—Ameritech. It must be remembered that employers are not absolutely liable for workplace harassment (*Meritor*, 477 U.S. at 72, 106 S.Ct. at 2408). Instead such cases as *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 446 (7th Cir.1994) teach:

> Rather, the employer is liable only if it knew, or should have known of the employees' acts and failed to take appropriate remedial action.

There is no contention here that Scott occupies a high enough place in the corporate hierarchy so that her actions were directly ascribable to Ameritech. Gray must therefore show (in the same limited sense as referred to in the preceding footnote) that Ameritech either knew or should have known of Scott's discriminatory actions and then failed to take reasonable actions in response.

Gray has failed utterly in that respect. It is uncontroverted that she did not file a complaint either with Ameritech's internal EEO office or with EEOC before she left Ameritech's employ in August 1994 (A. 12(M) ¶¶ 10, 14). Nor did she personally complain to anyone in Ameritech management (including Sons, the manager of the Canal Street office). Thus Ameritech was not made aware of Scott's actions via any official channels.

Gray tries to save her claim by pointing out that she did complain to union steward Caver and that she thought Caver would carry her complaints on to Ameritech management. But what Gray *thought* is really irrelevant—instead the question is what Ameritech knew or should have known about any harassment that was taking place. Hence the question becomes what Caver communicated to Ameritech management that could reasonably form the basis of Ameritech's knowledge. Caver admits that she filed only one formal grievance on Gray's behalf against Scott, and that was because of a performance-related suspension having nothing to do with Scott's alleged disability-based harassment of Gray (Caver Dep. 88).

---

9. Although our Court of Appeals has never addressed the issue, this Court's colleague Honorable Suzanne Conlon has assumed the availability of a hostile environment theory under ADA (*Chua v. St. Paul Fed. Bank for Sav.*, 1996 WL 34458, at *4 (N.D.Ill. Jan. 26, 1996)). Because Gray's case fails on other grounds, and because

Ameritech has acquiesced on the point, this opinion will indulge the same arguendo assumption.

10. At this summary judgment stage, of course, Gray need not "prove" anything. It would suffice for her to create a genuine issue of fact in that respect.

Caver also testified that on two occasions she spoke informally with Sons about Gray's complaints concerning Scott (*id.* 116). One of those conversations was also about a performance-related problem not relevant to the instant issue (Caver Dep. 120).

That leaves just one conversation between Caver and Sons from which it might be at all possible to impute knowledge to Ameritech. That occurred some time in the spring of 1994, after Scott had asked Gray to sit at the same terminal each day because of her skin condition. That was a change from the usual practice among Ameritech operators—because the terminals are fungible, operators were allowed to sit at any vacant terminal when they reported for work each day (Caver Dep. 116). After Caver told Sons that Scott's request for Gray to sit in a particular seat each day would be contrary to the collective bargaining agreement (Caver Dep. 116–18), apparently Sons then spoke to Scott, who made sure that Gray was never again asked to sit at the same terminal each day (*id.* 119).

For Gray's hostile environment theory to go forward, this Court would have to find that a reasonable jury could infer from that one conversation between Caver and Sons that Ameritech knew or should have known that Scott was harassing Gray because she regarded Gray as having a disability. Such an inference would not be reasonable.

First, although Caver told Sons that Scott had asked Gray to sit at one terminal because of Gray's skin condition (Caver Dep. 118–19), it would really defy common sense to conclude that Sons could or should have known from that one incident that Scott was harassing Gray because of her skin condition. That was an isolated event—remember that neither Caver nor Gray herself took any other complaints about Scott's behavior to Sons or any other person in Ameritech management. It simply is not reasonable to impute to Sons—and then to Ameritech—knowledge that Scott was creating a hostile work environment because of Gray's skin condition based on that single instance, even if it did show a lack of sensitivity on Scott's part.

Furthermore and as an independent basis for rejecting Gray's claim, Sons took an unquestionably reasonable step in response. Although the record does not specify what Sons said to Scott, it is undisputed that Gray was never again asked to sit at one terminal every day. Thus Sons took care of the problem, and Gray never complained again until two weeks *after* she left Ameritech. What more could Gray expect of Sons and Ameritech? That is still another reason why Ameritech cannot be held liable.

In sum, Gray has proffered nothing to support the position that Ameritech knew or should have known that one of its relatively low-level managers was creating a hostile environment situation. Because Ameritech management was aware of only one incident involving Gray and Scott, and because Ameritech—acting through Sons—handled that problem as soon as it arose, Gray has not shown that Scott's actions (even if violative of ADA) can be attributed to Ameritech. Hence Ameritech is entitled to summary judgment on that ground alone.

### Constructive Discharge

■ Ameritech also urges that it is entitled to summary judgment because Gray was not "constructively discharged." Because Gray has already lost her case on the basis just discussed—and also because Gray surprisingly does not respond to Ameritech's constructive discharge argument at all—this opinion will note only briefly that Ameritech is also entitled to summary judgment on that second ground.

■ Of course no ADA claim can succeed unless the claimant suffered some sort of adverse employment action. Here Gray opted to enter into a voluntary pension enhancement program and leave the company. That she left of her own accord does not necessarily spell defeat for Gray if she can show that she was constructively discharged—a judicially-created concept that provides relief when "working conditions were so intolerable that a reasonable person would have been compelled to resign" (*Chambers v. American Trans Air, Inc.*, 17 F.3d 998, 1005 (7th Cir.1994)). Because that is an extraordinary approach, courts have

added the requirement that "[a]n employee must seek legal redress while remaining in his or her job unless confronted with an 'aggravated situation' beyond 'ordinary' discrimination" (*Rodgers v. Western–Southern Life Ins. Co.,* 12 F.3d 668, 677 (7th Cir.1993), repeating the *Brooms v. Regal Tube Co.,* 881 F.2d 412, 423 (7th Cir.1989) quotation from *Bailey v. Binyon,* 583 F.Supp. 923, 929 (N.D.Ill.1984)). As the previous section has made clear, Gray did not seek legal redress while she remained an Ameritech employee, so she faces the burden of showing that her situation was something "beyond ordinary discrimination" that warrants the extraordinary relief of a constructive discharge theory.

Gray has not done so—indeed, she does not even address the issue. Her Mem. 11 sets out ten different types of "abusive and harassing behavior" that she says were undertaken by Scott to create a hostile environment. But even if it were to be assumed that those actions by Scott did create such an environment, this cannot reasonably be characterized as the type of extraordinary situation in which a constructive discharge theory is available even though Gray did not seek legal redress before leaving her job. And recall that Gray not only gave Ameritech notice that she was leaving, but that she then proceeded to work 30 more days so that she could reap the benefits of the pension plan enhancement program—hardly the type of behavior that one would expect from a person so oppressed by her working conditions that she could not attempt to seek legal redress before leaving her job (A. 12(M) ¶ 16). This is yet another reason why Ameritech is entitled to summary judgment.

### Conclusion

Although Scott arguably treated Gray as if she was disabled and thus made the protections of ADA available to Gray, there are two fatal gaps in Gray's lawsuit. First, she has failed to create a genuine factual issue as to whether Scott's actions can fairly be attributed to Ameritech, the lone defendant in this case. Second, she has offered no evidence that this is the sort of extraordinary situation that supports a constructive discharge claim

when she did not seek legal redress while still on the job.

Ameritech has therefore met its burden of establishing that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law. No reasonable jury could conclude that Gray is entitled to recover under ADA. This action is dismissed with prejudice.