Vincent J. KROCKA, Plaintiff,

v.

James BRANSFIELD and the City of
Chicago, an Illinois Municipal
Corporation, Defendants.

No. 95 C 627.

United States District Court,
N.D. Illinois,
Eastern Division.

June 24, 1997.

See also: 958 F.Supp. 1333.

James Michael Chesloe, Willow Springs, IL, Terrance Anthony Norton, Chicago, IL, for Vincent J. Krocka.

Thaddeus S. Machnik, Eileen B. Libby, Shelly Rachel Remen, City of Chicago, Law Dept. Corp. Counsel, Chicago, IL, Susan S. Sher, Corp. Counsel, City of Chicago, Chicago, IL, for James J. Bransfield.

## MEMORANDUM OPINION AND ORDER

LINDBERG, District Judge.

Plaintiff Vincent J. Krocka is a police officer in the 16th District of the Chicago Police Department ("CPD"). He brings this action against the City of Chicago ("City") under Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12111 et seq., and Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, to remedy allegedly unlawful employment practices and discrimination on the basis of disability. In addition, Krocka brings a claim against Dr. James Bransfield, former chief surgeon of the CPD, pursuant to 42 U.S.C. § 1983 for deprivation of his constitutional and statutory rights. Both plaintiff and defendants have moved for summary judgment.

### I. Background

Krocka began working for the CPD in January 1984 and has been assigned to the 16th District since 1992. As a beat officer, Krocka performs patrol duties that involve answering calls, writing tickets, making arrests and going to court. Krocka is now a licensed attorney in Illinois, Washington, DC, and Florida; and works 20 to 25 hours a week as an attorney in addition to his police work. From 1990 until 1992, he took a leave of absence from the police force to study for the bar and practice law.

Plaintiff has experienced depression nearly all of his life, with symptoms including irritability, antisocial behavior, fear, anxiety, upset stomach, gagging, loss of self-esteem, feelings of worthlessness, insomnia, an aversion to social contact and the inability to get out of bed. He has had problems with authority figures since he was a child and responds negatively to supervisory personnel in employment. His feelings of irritability and antisocial behavior have existed "throughout his working career." Krocka's bouts with more severe depression have lasted from six months to a year.

After he finished law school and began practicing, Krocka went through a period of depression, during which he experienced an inability to get out of bed for much of the day, although he stated that it did not affect his ability to research or write. During this time, his law partner would call him in the morning to get him out of bed when they had to be in court. On days that Krocka did not have to be in court, he stayed in bed until early afternoon.

In 1990, plaintiff told his physician, Dr. Glenn Cabin, that he was experiencing difficulty with authority figures at the CPD, that he had been terminated from a law firm after being accused of sexual harassment, and was having trouble finding another legal position. The law firm at which Krocka was working terminated him in July 1990 after a clerk accused him of sexual harassment.[1] Krocka indicated that he thought he might be having a nervous breakdown, that he did not get out of bed until early afternoon, was short-tempered and felt that his job situation was deteriorating.

Throughout his working life, plaintiff has been fired numerous times. Krocka stated that he had not gotten along with supervisors at previous positions, including a security position at the University of Chicago that he held from 1975 to 1977. Krocka began working at the Evanston Police Department in November 1977, where he admitted he was sometimes insubordinate towards supervisors and did not get along with his fellow officers. Krocka was fired from this position in May 1978, while still on probation, for misconduct.[2] After his termination, Krocka experienced a more severe period of depression and contemplated suicide. He began working as a security officer at Swedish Covenant Hospital in December 1978 but was terminated approximately a month later for excessive absenteeism. In 1979, Krocka was fired from a job with the University of Illinois campus police force when it learned about his discharge from the Evanston Police Department. In Spring 1991, Krocka began working for the Federal Aviation Administration, a position he lost in April 1992 for using the

---

1. Krocka maintains that he had merely asked her to lunch.

2. Krocka disputes the truth of the reasons given for many of his terminations, including this one.

phone for personal business.[3] Krocka returned to the CPD in 1992 and has continued to maintain a private law practice, which has become increasingly active over the years.

Dr. Cabin referred Krocka to Dr. Michael Bresler, a psychologist, who began intensive psychotherapy in weekly sessions that lasted until mid–1992. Dr. Bresler also referred plaintiff to another psychologist, Dr. Edward Wittert, for an interview and testing to confirm Dr. Bresler's diagnosis of depression. Dr. Wittert diagnosed plaintiff as having dysthymia associated with an impulse control disorder and mixed obsessive-compulsive and paranoid personality features. Dysthymia is defined as mild to moderate depression that lasts more than two years in an adult. Dr. Bresler indicated that plaintiff's depression was in the range of low end of severe to high end of moderate. He also experienced "double depression," which refers to dysthymia that is punctuated by a bout of major depression.

Dr. Bresler recommended that plaintiff begin taking Prozac, and Dr. Cabin prescribed it for Krocka based on this recommendation. Prozac is an antidepressant medication that entered the market in the late 1980s. It is prescribed to treat depression and in 1 in 100 to 1 in 1,000 users can cause physical side effects such as chills and fever, abnormal dreams and agitation, migraines, neck rigidity and pain, and dermatological conditions, among others. Although Dr. Bransfield stated that ataxia, or stumbling and falling, can be a side effect of taking Prozac, the Physician's Desk Reference does not list it as such. Dr. Bransfield stated that the literature he read indicated that a small percentage of users have experienced suicidal or homicidal ideation while taking Prozac. Eli Lilly, the manufacturer, advises patients not to drive or operate hazardous machinery until their doctor determines that Prozac is not affecting them. The drug reaches a steady state in the body within two weeks. Both Drs. Cabin and Bresler monitored plaintiff's use of Prozac. Besides the weekly sessions with Dr. Bresler, Krocka spoke to Dr. Cabin every 90 days. Although Dr. Cabin did not personally observe plaintiff using a firearm or driving a car, plaintiff stated that Dr. Wittert tested his motor skills and indicated that they were "intact."

Dr. Bresler testified that after Krocka began treatment with Prozac, he was functioning much better in all areas of life and that "within a few weeks [of beginning Prozac] we saw considerable improvement in Mr. Krocka's overall condition. His symptoms of depression diminished significantly, and his functioning in his family and on the job improved considerably." Bresler also indicated that plaintiff's touchiness, impatience and overaggressiveness could be the result of depression because "the discomfort of the symptoms" can make a person touchy or irritable. According to Bresler, depression affects a person's performance in general.

In 1991, when plaintiff reduced the amount of Prozac he took for about four to six months, his depressive symptoms returned. In April 1992, Dr. Bresler administered the Millon Clinical Inventory, which indicated that plaintiff was at the low end of the scale for dysthymia, and the Beck Depression Inventory, which indicated that plaintiff was at the lower end of moderate depression. Dr. Bresler increased plaintiff's Prozac dose in late 1993 from 20 mg a day to 30 mg a day. In 1995, Dr. Bresler moved out of state and plaintiff began seeing Dr. Peter Fink for psychotherapy and for prescriptions for Prozac.[4] Dr. Fink has diagnosed Krocka as having a major depressive disorder that is recurrent and in remission; and a separate dysthymic disorder in remission. He counsels Krocka every three to four months; and also monitors Krocka's Prozac use and watches for signs of depression and mood instability. Dr. Fink states that plaintiff's cognitive abilities are unaffected by taking Prozac. He states that plaintiff is resilient and has the capacity to function in pressured situations. Krocka states that he still suffers diminished symptoms of depression, including irritability, insomnia, stomach problems,

---

**3.** He claims that although "everyone else" committed this infraction as well, others were not terminated and his supervisor was merely jealous of Krocka's law practice and extra income.

**4.** Krocka is also consulting Dr. Fink for the purpose of using him as an expert in this litigation.

and difficulty getting out of bed. He intends to take Prozac for the rest of his life, and would experience serious depressive symptoms if he stopped taking it. In April 1995, plaintiff stopped taking Prozac for three days, after which he felt that he had no energy and did not want to do anything.

In October 1991, Commander Richard Wedgbury, Director of the Labor and Management Affairs Division of the CPD, developed and implemented a written Psychotropic Medication Policy in response to the CPD's concerns about armed police officers on such medication. Wedgbury consulted with psychiatrists at area hospitals, who indicated that decisions as to the duty status of an officer taking Prozac should be made on a case-by-case basis. The policy states that no officer will be deemed psychologically fit for duty while taking psychotropic medication unless the officer's treating psychiatrist indicates that the officer is being closely monitored and that the medication is not impairing the officer's judgment, cognitive abilities, reaction time, driving skills or performance abilities. An officer could also be deemed fit for duty upon agreement of Dr. Bransfield and Stanard & Associates, a psychological evaluation firm hired by the CPD to examine officers.

In April 1993, Wedgbury updated the policy to require an officer's treating physician to attest that the officer can safely handle a firearm and to agree to monitor the patient and see the officer on a periodic basis, preferably once a month. Wedgbury stated that the policy is based on a concern that the taking of psychotropic medication indicates an underlying psychological problem that could affect the safety of others, including the public and the officer's family.

When the CPD learns that an officer is taking psychotropic medication, it mandates a physical exam and a psychological evaluation at Stanard & Associates. Dr. Stanard determines an officer's fitness for duty and makes recommendations regarding monitoring the officer. The CPD claims that these evaluations as to whether an officer is fit for duty were made on a case-by-case basis.

In November 1992, plaintiff fell down a flight of stairs while on duty and was rendered unconscious. After Krocka's return from medical leave, Dr. Bransfield learned that he was taking Prozac. On January 8, 1993, pending a physical examination by his own doctor and a psychological evaluation, plaintiff was relieved of his star and placed on medical roll. The same day, Dr. Cabin wrote a note to the CPD that stated that plaintiff had been on Prozac since October 1990, had no psychological abnormalities and could carry out his duties as a police officer. After a psychological evaluation at Stanard & Associates, plaintiff was found "symptom-free" but could not be deemed fit for active duty unless his physician—not just a psychologist—monitored his medication. The physician also had to indicate that Prozac was not impairing Krocka's judgment, cognitive abilities, reaction time, driving skills or performance ability. On January 14, 1993, Dr. Bresler wrote to Dr. Bransfield and stated that Krocka could perform all duties as a police officer. On February 9, 1993, Dr. Cabin wrote to Dr. Bransfield and stated that plaintiff was able to perform his full duties as a police officer, that his use of Prozac was being monitored, and that he was not suffering any adverse side effects from taking Prozac. On February 10, 1993, Dr. Stanard informed Commander Wedgbury that plaintiff was fit for active duty but should be placed in the Personnel Concerns Program for a year while on the medication.

Another element of the Psychotropic Medication Policy is that all officers taking such medication were placed in the Personnel Concerns Program and remain in that Program for as long as they take the medication. The Personnel Concerns Program is described in CPD General Order 83–3 as a vehicle by which the CPD can correct an officer exhibiting unacceptable behavior that is contrary to the goals of the CPD. Once an officer has been identified as exhibiting unacceptable behavior, placement in the Program is an alternative for dealing fairly and impartially with members who have not responded to routine corrective action or the increased supervision that may have already resulted if an officer has displayed Behavior Alert System Indicators. These indicators include: (1) excessive force, (2) complaint/disciplinary

history, (3) repeated Medical Roll use, (4) repeated minor transgressions in a 12–month period, (5) significant reduction in performance, (6) poor traffic safety record and (7) significant deviations from an officer's normal behavior.

Officers placed in the Program are assigned a Personnel Concerns Supervisor, who provides intensive supervision of the officer, including observing the officer in the field to see how he/she functions under normal working conditions. The supervisors do not provide psychological counseling to the officers in their charge. In May 1993, Sgt. Bradford Woods, then the manager of the Personnel Concerns Program, wrote a memo to Wedgbury requesting that Krocka be placed in the Program for one year based on Dr. Stanard's recommendation. Defendant asserts that in the CPD's view, plaintiff's use of Prozac fell under the Behavioral Alert Indicator of "significant deviation from his normal behavior."

On June 21, 1993, at a meeting attended by Woods and Sgt. Patricia Riegler, Woods informed plaintiff that he would be placed in the Program for a year because of his Prozac use. Sgt. Riegler was assigned as his Personnel Concerns Program Supervisor. As part of her duties, Riegler followed plaintiff on and appeared at his assignments, and made notations about him in a deficiency log kept in the 16th District Commander's office. She saw Krocka three or four times during his shift, although she was not required to get out of her squad car to supervise him. Supervisors of officers who are not personnel concerns are supposed to see officers twice a shift. Riegler also called plaintiff five to six times a night for status checks and followed him on almost every radio assignment and lunch location. Another officer, Garry Krieger, testified that at one point he and his partner decided not to request that Krocka be assigned to their car because they knew they would face increased scrutiny by a Personnel Concerns Supervisor. Officer Donald Rehling also indicated that it was more troublesome to be partnered with an officer in the Personnel Concerns Program because of the heightened supervision. During the course of Riegler's supervision of plaintiff,

she held two or three counseling sessions with Krocka. Krocka and Riegler did not like each other; Riegler complained to Commander Bergamin, the 16th District Commander, that she did not want to be plaintiff's Personnel Concerns Supervisor because he was hostile towards her. Krocka was not demoted, did not have his responsibilities decreased, and did not lose benefits or pay as a result of being in the Program. He will remain in the Program for as long as he is taking Prozac.

All CPD officers are evaluated every six months; at which time they receive a performance rating. The average score in the CPD is in the 80s and an 84 is considered a good score. From December 1987 to December 1990, plaintiff generally received scores ranging from 83 to 87; although in December 1984, he received a 71. In June 1993, plaintiff received an 84; in December 1993, an 82; and in June and December 1994, scores of 85. Plaintiff has not been denied a pay increase, promotion, benefits or a transfer or reassignment request because of any performance rating.

For much of his tenure with the CPD, plaintiff has worked the 3rd Watch, which is the 4 p.m. to midnight shift. Under their collective bargaining agreement, police officers may bid for shift and position vacancies according to seniority. Plaintiff first requested the 3rd Watch in 1983 so that he could be home during the day to care for his mother. In later years, plaintiff made similar requests so that he could take his mother to medical appointments, take his hypertension medication, study for the bar exam and practice law.

In mid-December 1993, plaintiff learned that he was being assigned to the 1st Watch, which is the midnight to 8 a.m. shift. He asked Bergamin, his Watch Commander, if he could continue on the 3rd Watch for medical and health reasons, and informed Bergamin that being on 1st Watch would aggravate his health. He also produced a letter from Dr. Cabin, his physician, requesting that plaintiff remain on 3rd Watch because the midnight shift would affect his depression and hypertension. Bergamin left plaintiff on the 3rd Watch list although it appears that

he informed plaintiff that in February 1994, Krocka would be placed on the 1st Watch. Although Bergamin could place a percentage of officers on a watch of his choice, officers bid for positions based on seniority and he faced union grievances for allowing less senior officers the more popular shifts. District commanders could place officers who were in the Personnel Concerns Program on any shift, but Bergamin thought Krocka's one year period in the Program was almost completed.

On February 2 or 3, 1994, Bergamin informed plaintiff that he would actually remain in the Personnel Concerns Program for as long as he was taking Prozac. Some time thereafter, Bergamin also told Krocka that as long as Krocka was in Personnel Concerns, Bergamin had the discretion to assign him to any watch. The parties dispute when Bergamin so informed Krocka; the City alleges that it was in early February while Krocka maintains it was not until after he filed his state court complaint and EEOC charges in April 1994.

On February 4, 1994, while on duty, plaintiff experienced chest pains, palpitations in his left arm, tension, anxiety and light-headedness. His partner drove him to Resurrection Hospital to have his blood pressure taken. Krocka was hospitalized at Resurrection from February 4th to the 10th, and the CPD placed him on medical roll. While at Resurrection, plaintiff underwent stress tests, a chemical profile and an angiogram. On March 15, 1994, Dr. Cabin wrote a letter to the CPD, stating that plaintiff could return to work if he remained on the 3rd Watch.

On March 1, 1994, Dr. Bransfield ordered plaintiff to submit the results of a Prozac-level blood test. Dr. Bransfield testified that when he learned Krocka was taking Prozac, he consulted with Dr. Robert Barkin, a professor of pharmacology and head of the Poison Control Center at Rush–Presbyterian Hospital, who indicated that it was a good idea to get a Prozac blood level as a baseline measurement.

Dr. Cabin, who drew the blood during an examination at his office and submitted it to a lab for testing, testified that the level of Prozac in a person's blood does not correspond to whether or not the drug is working or how well it is working and that such a determination is "more of a clinical judgment." Dr. Bransfield also testified that Prozac acts on "subjective symptoms." He stated that "you get a Prozac level blood test to find out if the patient is taking the medication" and that all the test results told him was that "(i)t appeared that (Krocka) had Prozac in his blood. That's what it told." Although Dr. Bransfield stated that a series of blood tests might indicate over time whether the patient is taking the medication consistently or whether other medications might be affecting the Prozac level, Dr. Bransfield did not order tests for other medications in plaintiff's blood or any subsequent Prozac-level blood tests. Dr. Bransfield testified that at the time he ordered the test, Krocka was not displaying any bizarre behavior and had not been brought to his attention as having any job-performance or disciplinary problems. He never performed a physical examination of Krocka himself.

Plaintiff filed discrimination charges with the EEOC on April 15, 1994. On April 25, 1994, he filed a state court complaint against Riegler, Wedgbury, Bransfield, Matt Rodriguez (Superintendent of the CPD) and the City, alleging slander, intentional infliction of emotional distress and handicap discrimination.

On April 15, 1994, while still on medical roll for his coronary insufficiency, plaintiff appeared as an attorney at an arbitration hearing. Secondary employment while on medical roll is prohibited by the CPD's Rules and Regulations. The CPD Internal Affairs Division became aware of plaintiff's appearance at the arbitration after it received an unsigned, undated letter reporting the incident. It investigated the allegation and eventually issued a complaint register, which notifies the officer of the charges against him.[5] Plaintiff was eventually suspended for

---

5. Section 6.1(D) of the Labor Agreement between the City of Chicago and the Fraternal Order of Police in effect during the relevant

period indicates that anonymous complaints regarding medical roll abuse must be verified before a complaint register may issue. Lt. Eugene

five days without pay as a result of the medical roll violation. Plaintiff filed this action on February 1, 1995, alleging violations of the Americans with Disabilities Act, 42 U.S.C. § 1983 and various state common law claims.

Plaintiff returned from medical leave in early May 1994 and Bergamin assigned him to a limited duty post at Our Lady of Resurrection Hospital. In September 1994, plaintiff received an assignment to a limited duty post at the Alternative Response Unit, also known as the Call Back Unit. Officers in this unit respond to nonemergency telephone calls from the public and complete 30 to 50 call reports per shift. Three or four times a day, when there was an overflow of emergency calls, 911 would switch a call over to the Call Back Unit. On October 3, 1994, plaintiff produced a letter from Dr. Cabin requesting that plaintiff be assigned to full duty status in the 16th District on 3rd Watch because the stress from the unit was affecting plaintiff's hypertension. The CPD granted Cabin's request the following day. Plaintiff states that the CPD has never explicitly indicated that his placement on the 3rd Watch and on limited duty posts were reasonable accommodations for his depression.

## II. STANDARD FOR MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court must believe the evidence of the nonmoving party and construe the evidence in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986).

"The plain language of rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, the party with the burden of proof on an issue may not rest on its pleadings and must make affirmative factual allegations to demonstrate that a genuine issue of material fact exists. *Id.* at 324, 106 S.Ct. at 2553. Sufficient evidence that favors the non-moving party must exist before a triable issue can be found. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11.

## III. AMERICANS WITH DISABILITIES ACT

Plaintiff alleges that the City's placement of him into the Personnel Concerns Program is a per se violation of the ADA, that the blood test Bransfield ordered violated the ADA, that the City retaliated against him for filing an EEOC charge, and that it failed to provide a requested reasonable accommodation. The City has moved for summary judgment on all counts. Plaintiff has moved for summary judgment on his claims that he has a disability as defined by the ADA, that placement in the Personnel Concerns Program constitutes a per se violation of the ADA, and that the blood test Bransfield ordered violated the ADA and the Fourth Amendment.

### A. DISABILITY

■ To qualify for relief under the ADA, Krocka must establish: (1) that he is a disabled person under the ADA; (2) that he is qualified to perform the essential functions of his job with or without reasonable accommodation; and (3) he has suffered an adverse employment action because of his disability. *DeLuca v. Winer Industries, Inc.*, 53 F.3d 793, 797 (7th Cir.1995). The City asserts that plaintiff cannot satisfy this test because he is not a disabled person under the ADA.

■ The ADA defines a "disability" as:
(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual;
(B) a record of such an impairment; or

---

Karczewski testified that when an anonymous complaint is received, the investigator conducts

a preliminary investigation to determine whether a complaint register should even be filed.

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). Plaintiff asserts coverage under both the first and third prongs of this definition. Depression constitutes a "mental impairment" under the ADA.[6] *See, e.g., Gile v. United Airlines,* 95 F.3d 492, 496 (7th Cir.1996); *Pritchard v. The Southern Company Services,* 92 F.3d 1130, 1132 (11th Cir.1996). Krocka argues that his depression substantially limits his ability to interact with others and to work, and that the CPD regarded him as having a substantially limiting mental disorder because it placed him in the Personnel Concerns Program.

■ While acknowledging that plaintiff has been diagnosed with depression, the City maintains that plaintiff is not disabled by it and that his claim amounts to no more than a complaint that he cannot work for Sgt. Riegler on the 1st or 2nd Watch, which does not substantially limit his ability to work. The inability to perform a particular job, one aspect of a job or to work for one employer does not substantially limit a person's ability to work. 29 C.F.R. § 1630.2(j)(3). Even debilitating stress, when connected only with a particular job or supervisor, does not constitute a disability because it does not limit the employee in a range of jobs. *Weiler v. Household Finance Corp.,* 1995 WL 452977, *5 (N.D.Ill.), *aff'd,* 101 F.3d 519, 524–25 (7th Cir.1996).

Although defendants' recounting of the law is indeed accurate, the court does not interpret plaintiff's claim as one that his depression stems specifically from the stresses of working for the CPD or that he is limited only from working for Sgt. Riegler or on the 3rd Watch. Instead, his claim is that before he was treated for depression with Prozac and therapy, his abilities to function generally and to interact with others—and therefore to work—were substantially limited.[7] The record indicates that Krocka has been diag-

nosed with dysthymia; that his condition is biologically based; that he has experienced symptoms for most of his life; and that it is likely that he will require treatment for the rest of his life. Krocka also points to his multiple symptoms and his numerous firings from jobs in different fields, claiming that they are evidence that his depression predates his supervision by Sgt. Riegler. Therefore, the issue is not whether plaintiff is limited only from working in a particular shift or for a particular supervisor, but whether his depression does indeed substantially limit him in a major life activity.

■ As to this issue, defendants maintain that Krocka has not met his burden under either prong; in other words, that he is not 1) substantially limited in 2) a major life activity. First, they state that Krocka's attempt to show that he was substantially limited in interacting with others by recounting his poor work history amounts to nothing more than an "inability to follow work rules" that an employer is not required to tolerate. *See* EEOC Compliance Manual, Vol. 2, EEOC Order, "EEOC Definition of Term 'Disability' " § 902–10 n. 11 (misconduct that results from a disability not excused if employer would not tolerate such conduct from nondisabled employee). Again, although defendant's statement of the law is accurate, the court finds that plaintiff is not asking the CPD to ignore infractions that he committed as a result of his depression. Rather, he is pointing to the job difficulties and firings he experienced before he began working for the CPD as evidence that his depression did interfere with his work in a substantially limiting way and was not specific to a particular job or supervisor. He maintains that job difficulties such as tardiness, insubordination and not getting along with his peers were caused by the sleep disorder and irrita-

---

6. Although the City also asserts that plaintiff's hypertension, hypercholesterolemia and impotence did not substantially limit plaintiff, plaintiff claimed only that he was disabled by his depression, not by these conditions.

7. The court also does not read plaintiff's argument as one that he is requesting as a reasonable

accommodation that someone other than Sgt. Riegler supervise him. Instead, Krocka maintains that he should not have to be in the Personnel Concerns Program at all because he does not meet the criteria for the program and his placement therein is based on his alleged disability.

bility that resulted from his depression.[8]

The City also asserts that Krocka's depression stemmed from his problems at work rather than being the cause of them. The record indicates that the depression may have both caused difficulties and been exacerbated by them. Plaintiff's doctors testified that he suffers from "double depression," which means that in addition to his dysthymia Krocka sometimes had more severe bouts of depression in response to life events such as a termination or romantic disappointment. It appears that Krocka's terminations could be the result of his depressive symptoms and that the terminations in turn could have exacerbated the depression.

The City also denies that Krocka's depression substantially limits him in interacting with others or in working, and offers as support the evidence that Krocka has remained able to fulfill all of his duties as a police officer and a lawyer. Because plaintiff is able to perform this range of duties, defendants claim he is not substantially limited. The City argues that during the period that plaintiff alleges he suffered from depressive symptoms and was not yet being treated, he received good performance evaluations and was always able to work as a police officer and lawyer.[9] Despite his difficulties with supervisors, the City claims that Krocka did not encounter difficulties with every supervisor he had.

First, plaintiff was on leave from the CPD when he sought treatment for his depression. Plaintiff also points to his recurrent and ongoing depression as well as his chronic job difficulties to support his claim that he has a disability that has substantially limited him during his career. It was during his most recent period of depression that he sought counseling, presumably before the depression

took its full effect on his activities and work performance. Krocka contends that the court must examine his condition "without regard to mitigating measures such as medicines." 29 C.F.R. § 1630.2(h), (j). In other words, the court must consider plaintiff's condition as if he were not being treated with Prozac. *See Roth v. Lutheran General Hospital*, 57 F.3d 1446, 1454 (7th Cir.1995); *Sarsycki v. United Parcel Service*, 862 F.Supp. 336, 340 (W.D.Okla.1994) (fully functional diabetic who would become disoriented and eventually lapse into a coma without insulin had a disability as defined by the ADA).

The evidence in the record is conflicting. As the court in *Mendez v. Gearan*, 956 F.Supp. 1520 (N.D.Cal.1997) pointed out, determining whether depression is substantially limiting is particularly fact specific because the "nature ... of the impairment is not consistent from day-to-day." *Id.* at 1524 (applying Rehabilitation Act). Krocka's doctors testified that his symptoms included irritability, antisocial behavior, fear, anxiety, upset stomach, low self-esteem, insomnia and inability to get out of bed. Dr. Fink has diagnosed Krocka as having a major depressive disorder that is recurrent and in remission; and a separate dysthymic disorder in remission. Dr. Bresler testified that since Krocka began treatment with Prozac, he was functioning much better in all areas of life and that "within a few weeks [of beginning Prozac] we saw considerable improvement in Mr. Krocka's overall condition. The symptoms of depression diminished significantly, and his functioning in his family and on the job improved considerably." Dr. Bresler also indicated that plaintiff's touchiness, impatience and overaggressiveness could be the result of depression because "the discomfort of the symptoms" can display these characteristics.

---

**8.** Although the ADA does not include "interacting with others" in its list of major life activities, that list is not intended to be all inclusive. The EEOC Compliance Manual does include "interacting with others" as a major life activity. *See Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994) (agency administering statute given deference in interpreting statute).

**9.** Defendant also responded that the inability to interact with others makes plaintiff unqualified for his position as an officer because he is unable to perform its essential functions, which include interacting with the public. This again ignores that the plaintiff isn't claiming that he currently cannot interact with the public even with medication. Although the City also contends that no reasonable accommodation for this limitation is possible, plaintiff did not request a reasonable accommodation that would address this aspect of his disability.

According to Dr. Bresler, depression affects a person's performance in general. Krocka's bouts with depression have lasted from six months to a year. When he reduced his Prozac dosage for several months, his depressive symptoms returned.

The facts in this case also bear resemblance to those in *Pritchard v. The Southern Co. Services*, 92 F.3d 1130 (11th Cir.1996). There, plaintiff was diagnosed with depression and dysautonomia. Her symptoms included profound fatigue; lack of interest and energy; difficulty sleeping, communicating, and concentrating; suicidal thoughts; depressed affect and irritability. *Id.* at 1133–34. The 11th Circuit stated that this evidence "present(ed) a case for a jury to determine whether (plaintiff) suffered from those symptoms when she was terminated, and whether those symptoms substantially limited a major life activity." *Id.* Other courts have found a doctor's diagnosis and medication, or employment difficulties to be enough to survive motions for summary judgment. *See McCrory v. Kraft Food Ingredients*, 98 F.3d 1342 (Table), 1996 WL 571146, *5 (6th Cir.1996) ("undisputed" that plaintiff who was treated with medication and received psychotherapy had an ongoing disability under the ADA); *Office of the Senate Sergeant at Arms v. Office of Senate Fair Employment Practices*, 95 F.3d 1102, 1107 (Fed.Cir.1996) (diagnosis of depression from three doctors).

The court finds that there is enough conflicting evidence concerning the severity of plaintiff's condition to allow it to proceed to a jury. Plaintiff's counselors indicated that he experienced recurrent episodes of more severe depression that lasted from six months to a year. The assessment of how much weight to give the doctors' testimony and the determinations of how large a role depression played in plaintiff's employment and personal difficulties and how well he would function without Prozac are best left to a jury, which can assess the credibility of the many witnesses offered. Although the record is not so clear that plaintiff is entitled to summary judgment, the evidence is sufficient at least for him to avoid defendants' motion and proceed to a jury on this issue.

**B. Regarded as Having a Disability**

■ Plaintiff also asserts that he falls under the third prong of the ADA's definition of disability because defendants regarded him as being substantially limited and perceived him as having a mental impairment that posed a safety risk to the public and exposed the City to potential liability. Upon learning that plaintiff was taking Prozac, the CPD placed him on leave, required a physical and psychological exam, and placed him in the Personnel Concerns Program indefinitely. To support his argument that the CPD viewed him as having a disability that substantially limited him, plaintiff also relies on Wedgbury's statement that someone on Prozac must have some serious underlying problem to warrant a doctor's prescribing the drug.

Defendant responds that after plaintiff underwent the physical and psychological exam at that time, he was reinstated to the police force. At no time after these medical exams did the CPD restrict Krocka's job duties or ability to carry a gun. It argues that placing an employee on restrictive duty until it determines that the employee can perform his job does not suggest that the employer regards the employee as having a disability. *Thompson v. City of Arlington*, 838 F.Supp. 1137, 1152 (N.D.Tex.1993) (citing 42 U.S.C. § 12102(2)). Here, the CPD reinstated Krocka to his previous position after he completed his physical and psychological exams. It points out that Wedgbury's statement referred to why the CPD initially requires an exam for an officer taking Prozac and not to how he specifically viewed Krocka after he completed the exam and was deemed fit for duty.

Courts in this district have found a genuine issue regarding whether an employer regarded an employee as having a disability when the employer limited the employee's duties or placed him or her on medical leave. For instance, in *Dertz v. City of Chicago*, 1997 WL 85169 (N.D.Ill.), a police officer underwent psychological testing at Stanard & Associates—as Krocka did—which deemed him unfit for duty and indicated that he was "severely disturbed." The CPD did not al-

low the plaintiff to return to work for two years and then offered him a position as a 911 dispatcher. Although the court noted that keeping an employee on the job is "persuasive evidence" that the employer did not consider the employee disabled, the two-year delay in offering the plaintiff the 911 position as well as the fact that he was not reinstated to the same position was enough to create a genuine issue. *Id.* at *9. *See also Gray v. Ameritech Corp.*, 937 F.Supp. 762, 770 (N.D.Ill.1996) (employee with psoriasis who was believed to be contagious and asked to take a medical leave until her skin condition cleared up created a genuine issue as to whether the employer regarded her as disabled).

Although the CPD placed Krocka on medical leave upon discovering that he took Prozac, it reinstated him to his previous position after Stanard & Associates deemed him fit for duty. This indicates that the CPD had come to the conclusion that Krocka could at that time perform all of the duties required of an officer and did not regard him as substantially limited. Plaintiff's motion for summary judgment as to whether the CPD regarded him as having a substantially limiting disability is denied.

### C. Discrimination

#### 1. Personnel Concerns Program

■ Plaintiff requests summary judgment on his ADA claim, asserting that his placement into the Personnel Concerns Program constitutes a per se violation of the ADA's prohibition against "limiting, segregating, or classifying an ... employee in a way that adversely affects the opportunities or status of such ... employee because of the disability of such ... employee." 42 U.S.C. §§ 12112(a), (b)(1). Krocka argues that the mandatory placement of every officer the CPD discovers is taking Prozac into the stigmatizing Personnel Concerns Program is not justified by any legitimate safety concern. He refutes the city's contention that public safety issues justify this placement by pointing to his being deemed fit for duty by Stanard & Associates and his own doctors.

■ The City responds that it had a legitimate reason for placing plaintiff in the Personnel Concerns Program because it was concerned about the possibility of impairment while he was taking Prozac. Defendants contend that they have proffered a "legitimate, nondiscriminatory reason" for the policy and that plaintiff has failed to respond with evidence that this purported reason was pretextual. This burden-shifting analysis is appropriate when the plaintiff is offering indirect evidence of discrimination. *DeLuca v. Winer Industries, Inc.*, 53 F.3d 793, 797 (7th Cir.1995). Here, plaintiff is arguing instead that mandatory placement of officers taking Prozac into the Personnel Concerns Program is a facially discriminatory policy that the CPD asserts is justified because the officers might pose a risk to themselves or to the public. To use safety concerns as a justification for a restrictive employment practice, the CPD must show that the individual poses a "direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(b); *Sarsycki v. United Parcel Service*, 862 F.Supp. 336, 341 (W.D.Okla.1994) (policy barring insulin-dependent diabetics from driving on public highways could only be justified by showing diabetics pose a "direct threat" to others). "Direct threat" is defined as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). Such a determination requires an individualized assessment of the employee. 28 C.F.R. § 36.208(c); *Bombrys v. Toledo*, 849 F.Supp. 1210, 1219 (N.D.Oh.1993).

Plaintiff claims that the CPD made no individualized determination that he was a direct threat to anyone and that placing him in the Personnel Concerns Program therefore violated the ADA. The City responds that it did individually assess Krocka when it sent him to Stanard & Associates for evaluation and reinstated him to his full duties. The problem with this analysis is that plaintiff is not challenging his mandatory medical leave or psychological evaluation, he takes issue only with his placement in the Personnel Concerns Program. Although Stanard & Associates recommended placement in the Program for a year, it did not find that

Krocka posed any threat to himself or others. In addition, the CPD informed plaintiff that he would remain in the Program for as long as he took Prozac. The City also admitted that any officer the CPD knew was taking Prozac would be placed in the Program and would remain in that Program for as long as he or she took psychotropic medication. Therefore, CPD policy permits no individualized assessment as to whether or not an officer taking Prozac should be placed in the Personnel Concerns Program. *See Sarsycki,* 862 F.Supp. at 341.

 The CPD also tries to justify plaintiff's placement in the Program by asserting that it did determine whether or not plaintiff was a direct threat through the psychological and medical exams it required. Apparently, defendants are arguing that a process of determining *if* an employee is a direct threat is the same as a conclusion that he or she *is* a direct threat. This is a misapprehension of the law. The City made an evaluation as to whether Krocka was a direct threat to others. It concluded that he was not. Nevertheless, because it feared that plaintiff might still pose a safety risk, it placed him in the Personnel Concerns Program and informed him that he would stay in the Program for as long as he continued to take Prozac. Therefore, the CPD has not shown that Krocka's placement into the Program resulted from a determination that he posed a "direct threat" to others.[10]

The City's justification of safety concerns is also suspect because there is no evidence that placement in the Program actually accomplished any safety control or monitoring. The City maintains that close monitoring of officers on Prozac is necessary because of the potential side effects of the medication, which it claims could affect an officer's performance.[11] The record indicates that the Personnel Concerns Program supervisors had no training in such monitoring of officers' behavior and that the Program was not designed

with this purpose in mind. The requirement that the officer's doctor monitor his behavior and report to the CPD would appear to more than adequately assure the CPD that an officer was not negatively reacting to his medication, as a doctor is more qualified to discern potentially problematic side effects of a drug than a Personnel Concerns Supervisor. Instead, the Personnel Concerns Program was actually a final chance given to officers who had failed to respond to previous disciplinary measures. The CPD policy is based only on broad-based assumptions that people on Prozac exhibit symptoms that are "significant deviations from normal behavior" often enough to require constant supervision.

 Although the CPD argues that placement in the Program did not discriminate against officers with disabilities because nondisabled officers were also placed in the Program, this is a faulty analogy. The nondisabled officers who were placed in the Program had committed multiple previous infractions. The same standard was not used for officers taking Prozac, who are subject to placement in the Program although they had no previous disciplinary problems. Because Krocka's placement in the Program was based only on Prozac use and not on any breach of discipline, the City's argument that without this policy the CPD won't be able to monitor officers is specious. Employees exhibiting behavioral problems can, as always, be placed in the Program regardless of whether or not they take Prozac. *See Den Hartog v. Wasatch Academy,* 909 F.Supp. 1393 (D.Utah 1995) (school did not discriminate against faculty member terminated because of son's threatening behavior on campus; action based on son's behavior and not his mental illness).

 The City's last defense of its action is that placement in the Personnel Concerns Program does not amount to an "adverse action" under the ADA because plaintiff lost

---

**10.** The fact that plaintiff had been taking Prozac for two years before the CPD discovered this and placed him in behavioral concerns is further evidence that he had displayed no behavioral symptoms from the medication, or any "significant deviation from normal behavior" that would warrant placement in the Program.

**11.** The evidence also indicates that only a small percentage of Prozac users experience such side effects and that most symptoms manifest within several weeks of beginning treatment.

no pay or benefits, and did not have his responsibilities changed as a result of being in the Program. They contend that the increased supervision attendant to the Program is not enough to constitute an adverse employment action, citing *Crady v. Liberty National Bank & Trust*, 993 F.2d 132 (7th Cir.1993); and *Howard v. Navistar International Transportation Corp.*, 904 F.Supp. 922, 931–32 (E.D.Wis.1995).

■ Under the ADA and Title VII, the employment action at issue must be a "materially adverse change in the terms and conditions of employment (that) must be more disruptive than a mere inconvenience or an alteration of job responsibilities" before it constitutes an actionable claim. *Crady*, 993 F.2d at 136. In *Crady*, the plaintiff was transferred from a branch manager position to a collections officer position at the same salary. The Seventh Circuit held that an adverse change in the terms and conditions of employment might include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.*

Unlike the facts in *Crady*, which involved a job transfer, or those in *Navistar*, where the employee's supervisor made only one derogatory comment about the plaintiff's disability, the situation here involves unwarranted disciplinary action that will continue indefinitely. Krocka's claim is therefore not based on a neutral change in job responsibilities or on a single incident. *See also Henry v. Guest Services, Inc.*, 902 F.Supp. 245, 252 (D.D.C. 1995) (receipt of one cartoon making fun of depression not an adverse action because it did not alter conditions of employment). Another officer testified that he and his partner had decided not to request Krocka's assignment to their car because they knew they would face increased scrutiny by a Personnel Concerns Supervisor. Limiting, segregating or classifying based on disability violates the ADA, and placing all officers taking Prozac into a disciplinary program indeed segregates or classifies in a way that adversely affects the employees' status. 42 U.S.C. § 12112(a) (prohibiting discrimination "in regard to ... other terms, conditions, and privileges of employment"). Placement in the Program will indefinitely subject Prozac users who have not committed infractions to more intense supervision than nondisabled officers who have not committed infractions. The Prozac policy classifies based on disability; it is a disciplinary program that subjects employees to increased supervision; it has daily and ongoing effects on officers; has negative connotations because it is a disciplinary measure for employees who are committing repeated infractions; and possibly limits job opportunities if other officers choose not to work with officers in the Program. The requirement that the job action has to limit in a way that "adversely affects the job opportunities or status of such employee" is present here.

### 2. Failure to Provide Reasonable Accommodation

■ Defendants request summary judgment on plaintiff's claim that the CPD did not provide him with the reasonable accommodation of the 3rd Watch. 42 U.S.C. § 12112(b)(5)(A). They point out that plaintiff received every shift accommodation he requested and never worked on the 1st Watch, which was the shift he and his doctor stated would negatively affect his depression and hypertension. The delay in assignment to the 3rd Watch on which plaintiff bases his claim actually occurred as a result of his medical leave.

Plaintiff's only response is that he was never "officially" notified that he received the reasonable accommodation, and that the "pivotal question" is whether he was granted the shift change in anticipation of litigation or for some other reason. He also argues that his assignment to the 3rd Watch was only temporary. Krocka provides no support for this claim that notification of a reasonable accommodation is required in some "official" form. Once Krocka was informed that his shift would not change, his right to a reasonable accommodation was satisfied.[12] *See Beck v.*

---

12. Commander Bergamin also testified that one of the reasons he could not give Krocka the shift

*University of Wisconsin Board of Regents*, 75 F.3d 1130, 1135("(a)n accommodation is something concrete—some specific action required of the employer"). Determining the proper reasonable accommodation is supposed to be an "informal, interactive process." *Id.* (citing 29 C.F.R. § 1630.2(*o* )(3)). Krocka's insistence on formal notification serves no purpose in this process. The City's motion for summary judgment on plaintiff's claim that he was denied a reasonable accommodation is granted.

### 3. Retaliation

■ The City has also moved for summary judgment on plaintiff's claim that he was disciplined in retaliation for filing the EEOC charge and state court complaint. In February 1994, plaintiff was placed on medical roll after being hospitalized for a coronary insufficiency. On April 15, 1994, while still on medical roll, plaintiff appeared as an attorney at an arbitration hearing for one of his cases. Secondary employment while on medical roll is prohibited by the CPD's Rules and Regulations. The CPD Internal Affairs Division became aware of plaintiff's appearance at the arbitration after it received an unsigned, undated letter reporting the incident. It investigated the allegation and eventually issued a complaint register, which is not disciplinary in itself but simply notifies the officer of the charges against him.[13] Plaintiff was eventually suspended for five days without pay as a result of the medical roll violation. He claims that the anonymous complaint was filed as a retaliatory response to his EEOC charge and state court complaint.

To establish a prima facie case of retaliation under the ADA, plaintiff must show that (1) he engaged in statutorily protected expression, (2) he suffered an adverse action by the employer, and (3) there is a causal link between the protected expression and the

adverse action. *Roth v. Lutheran General Hospital*, 57 F.3d 1446, 1459 (7th Cir.1995). Krocka meets his burden under the first prong because of the charges he filed and the second by his suspension without pay. His difficulty lies in trying to establish a causal link between his discrimination charges and the anonymous complaint that led to the suspension. Plaintiff does not know the source of the anonymous complaint. The defendants named in the EEOC charge and state court complaint have each stated in affidavits that they did not file the complaint or direct anyone else to do so. Plaintiff does not deny that he did in fact appear at the arbitration hearing and that doing so violated CPD rules. The CPD investigators who independently verified the incident are not the supervisors against whom plaintiff lodged complaints or filed lawsuits.

■ The allegation that the complaint was merely the first attempt to build a record against the plaintiff in retaliation for his EEOC charge and state law complaint is completely unsupported by any evidence and amounts to mere speculation. When reviewing a retaliation claim, the court must consider all of the surrounding circumstances. *Berggruen v. Caterpillar Inc.*, 1995 WL 820127 (N.D.Ill.1995). The circumstances here do not indicate that the disciplinary action, taken for an infraction that plaintiff has admitted to, was in retaliation for his discrimination charges. Filing an EEOC charge does not protect an employee from fairly meted out discipline. Defendants' motion is granted as to plaintiff's retaliation claim.

## IV. CONSTITUTIONAL AND STATUTORY VIOLATIONS FOR REQUIRING BLOOD TEST

### A. Reasonableness of the Blood Test

■ Both plaintiff and defendants have moved for summary judgment on plain-

---

he requested was that it would subject Bergamin to union grievances and complaints. The ADA does not require a reasonable accommodation that would violate other employees' seniority rights under a collective bargaining agreement. 42 U.S.C. §§ 12112(b)(2), (b)(5)(A).

**13.** Section 6.1(D) of the Labor Agreement between the City of Chicago and the Fraternal Order of Police that was in effect during the

relevant period indicates that anonymous complaints regarding medical roll abuse must be verified before a complaint register may issue. Lt. Eugene Karczewski testified that when an anonymous complaint is received, as in this case, the IA investigator conducts a preliminary investigation to determine if the complaint has any merit even before issuing a complaint register.

tiff's § 1983 claim that Bransfield violated his Constitutional and statutory rights when he ordered plaintiff to submit the results of a blood test to determine the level of Prozac in plaintiff's system. Plaintiff's first basis for this claim is that ordering such a test violated the ADA. He notes that § 1983 actions may be based on purely statutory violations of federal law as well as on constitutional claims. *Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980). While true as a general rule, this is not the case when the statute at issue explicitly forecloses such enforcement or provides such a comprehensive remedial scheme that it is implied that the statute itself is the exclusive remedy. *Suter v. Artist* M., 503 U.S. 347, 355–56, 112 S.Ct. 1360, 1366, 118 L.Ed.2d 1 (1992); *Golden State Transit Corp. v. Los Angeles,* 493 U.S. 103, 106, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989).

The Seventh Circuit has held that claims based on Title VII of the Civil Rights Act may not be brought under § 1983. Title VII, on which the ADA's remedial scheme is based, provides a comprehensive enforcement procedure that plaintiffs could avoid simply by casting their claims as those under § 1983. *Alexander v. Chicago Park District,* 773 F.2d 850, 856 (7th Cir.1985), cert. denied, 475 U.S. 1095, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986). This analysis is equally applicable to claims brought to enforce rights protected by the ADA. *Holmes v. Chicago,* 1995 WL 270231 (N.D.Ill.). The only gain from bringing an ADA claim under § 1983 is that a plaintiff may avoid the administrative procedures the statute requires. *Id.* at *5. This is apparent in this case, where plaintiff is attempting to find Bransfield individually liable under § 1983 when such liability does not exist under the ADA. *E.E.O.C. v. AIC Sec. Investigations Ltd.,* 55 F.3d 1276 (7th Cir. 1995). Therefore, for plaintiff's § 1983 claims to be successful, he must establish that defendants violated his Fourth Amendment rights.

■ Bransfield and the City assert that they are entitled to summary judgment on the § 1983 claim because the blood test was reasonable under the Fourth Amendment. As the court stated in its memorandum and opinion on defendants' motion to dismiss, because the blood test was not ordered to serve the needs of law enforcement by collecting evidence of a crime, warrant and probable-cause requirements were inapplicable and resolution of the Fourth Amendment issue depended on the balance between the intrusion on Krocka's privacy interests and the City's interest in monitoring the Prozac level in Krocka's blood. *Skinner v. Railway Labor Executives' Assn.,* 489 U.S. 602, 616, 109 S.Ct. 1402, 1412–13, 103 L.Ed.2d 639 (1989) (quoting *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979)); *see also National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 665–68, 109 S.Ct. 1384, 1390–92, 103 L.Ed.2d 685 (1989) (government's "substantial interests ... present a special need that may justify departure from the ordinary warrant and probable-cause requirements"). At the motion to dismiss stage, the court noted that although the CPD had an interest in ensuring that its officers are fit for duty, there was no indication that testing for Prozac would further this goal by providing the CPD with any information that Krocka was a danger to himself or the public. Therefore, because there was no nexus between the test and the CPD's safety interest, the complaint adequately stated a claim for a violation of Krocka's Fourth Amendment rights.

■ In response, Dr. Bransfield replies again that the CPD had an overriding safety interest in determining the level of Prozac in Krocka's blood and "regulating the conduct of its police officers to ensure public safety and confidence that outweighed the minimal intrusion upon plaintiff's person and privacy." He argues that the invasive nature of the blood test was not unreasonable because it took place in plaintiff's own doctor's office and was a routine practice as plaintiff had his blood drawn and tested every several months. This is a valid argument only if the reason for the test is a legitimate one in the first place. "(I)t was settled law by 1994 that the Fourth Amendment protection against unreasonable searches and seizures could be implicated by quasi-medical procedures, such as compulsory blood testing ... albeit only when these procedures are 'unreasonable.' "

*Miller v. Evanston,* 1996 WL 167006, *3 (N.D.Ill.) (citing *Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 1833–34, 16 L.Ed.2d 908 (1966)); *see also Skinner,* 489 U.S. at 616, 109 S.Ct. at 1413 ("obvious" that blood test and ensuing chemical analysis infringes recognizable privacy right). The less invasive circumstances of the test are a legitimate consideration only when balancing it with a legitimate government interest. *Id.* at 619, 109 S.Ct. at 1414.

There is no doubt that the City has an "interest in the fitness of its police officers." *Wrightsell v. City of Chicago,* 678 F.Supp. 727, 733 (N.D.Ill.1988). To this end, police and fire departments' policies of annual medical exams, random drug testing, and drug testing based on individualized suspicion have been held to fall within the reasonable bounds of the Fourth Amendment. *Id.; Strawder v. City of Chicago,* 1989 WL 134335 (N.D.Ill.) (probationary police officer); *Policemen's Benevolent Association of New Jersey v. Township of Washington,* 850 F.2d 133, 141 (3rd Cir.1988); *Jackson v. Gates,* 975 F.2d 648, 652–53 (9th Cir.1992).

As the court in *Wrightsell* pointed out, testing for illegal drugs " 'as a part of a routine, reasonably required, employment-related medical exam' " was permissible " 'where there is a clear nexus between the test and the employer's legitimate safety concern.' " *Wrightsell,* 678 F.Supp. at 733 (quoting *Jones v. McKenzie,* 833 F.2d 335, 336 (D.C.Cir.1987)). The obvious nexus between on-the-job impairment and the ingestion of narcotics or alcohol—which have an immediate and drastic effect on perception, ability and judgment—has been presumed in courts' balancing of the government's need for safety with employees' privacy interests. *See Skinner,* 489 U.S. at 628, 109 S.Ct. at 1419. "(E)mployees ... must remain as alert as possible and free from lapses due to drugs." *Taylor v. O'Grady,* 888 F.2d 1189, 1197 (7th Cir. 1989) (discussing drug use by prison guards). "Possession, use, and distribution of illegal drugs represent 'one of the greatest problems affecting the health and welfare of our population.' ". *Harmelin v. Michigan,* 501 U.S. 957, 1002, 111 S.Ct. 2680, 2705–06, 115 L.Ed.2d 836 (1991) (citing *Von Raab,* 489 U.S. at 668, 109 S.Ct. at 1392).

Dr. Bransfield asserts that the Prozac-level blood test was reasonable because it furthered the CPD's interest in safety the way a test for illegal drugs or alcohol would. He bases this claim on his conversation with Dr. Robert Barkin, a professor of pharmacology and head of the Poison Control Center at Rush–Presbyterian Hospital, during which Dr. Barkin purportedly indicated that it was a good idea to get a Prozac blood level as a baseline measurement. Dr. Bransfield testified that he ordered the blood test to "establish a baseline measurement, which is important because any change in plaintiff's medical condition and medications could modify the effects of the medication." Although Dr. Bransfield stated that a series of blood tests over time might indicate whether other medications might be affecting the Prozac level or whether the patient is taking the medication consistently, Dr. Bransfield did not order tests for other medications in plaintiff's blood or any subsequent blood tests to determine Prozac levels over time. He offered no explanation of how he intended to interpret the test results or how they in any way helped him determine that plaintiff was either a danger to himself or the public or within a safe range. In fact, his testimony as to Dr. Barkin's advice indicates that his understanding of the usefulness of a baseline measurement is less than clear.[14] Dr. Barkin was not deposed, so the court has no first-hand explanation of how a baseline measurement can provide useful information to the CPD regarding safety interests. Dr. Cabin testified that the level of Prozac in a person's blood does not correspond to whether or not the drug is working or how well it is working, and that such a determination is "more of a clinical judgment." Dr. Bransfield agreed that Prozac acts on "subjective symptoms."

---

**14.** In response to a question at his deposition about why getting a Prozac blood level was important, Dr. Bransfield replied, "Dr. Barkin thought it was important. There are many reasons for it. You would have to go into it with him."

There is still no evidence in the record that supports Dr. Bransfield's position that the test served CPD's legitimate safety need for fit officers. His attempts to compare testing for Prozac to testing for narcotics or alcohol fall flat. The record contains no evidence that Prozac, a legally prescribed medication, has the serious effects on perception and judgment that narcotics or alcohol do. Also, while illegal drugs and alcohol affect all users, only 1 in 100 to 1 in 1,000 Prozac users are said to experience side effects, the most common of which appear to be minor. There is no evidence that side effects appear when, as here, the patient had been taking the medication without problems for some length of time. To the contrary, the record indicates that side effects appear within weeks after beginning treatment and the medication reaches a steady state in the body within two weeks.

Although Dr. Bransfield stated that Prozac blood levels can be affected by other medications, there is no indication that a higher level of Prozac in the blood leads to increased risk of or more extreme side effects. There is no indication that when combined with other medication, Prozac's side effects are intensified. The levels of other medications Krocka was taking were not measured.

Even if the court accepted defendant's emphasis on the rare but extreme possible side effects of Prozac, there is no tie between those side effects and blood levels of the drug. The test simply did not provide Bransfield with information as to whether Krocka was a safety risk because of his Prozac use. There is also no indication that the testing provided any information that the CPD did not already have. *Contra Von Raab, Skinner* (blood tests to discover whether the employees were surreptitiously taking illegal drugs or alcohol). Dr. Bransfield stated that "you get a Prozac level blood test to find out if the patient is taking the medication" and that all the test results told him was that "(i)t appeared that (Krocka) had Prozac in his blood." Krocka's doctors had confirmed that he was taking Prozac, that he was not experiencing side effects and that he was able to perform a police officer's duties. The CPD had placed him in the Personnel Concerns Program specifically to monitor his behavior.[15] As the court stated in its previous opinion, although Bransfield first learned that Krocka was taking Prozac in December 1992, Bransfield did not order the blood test until March 1994, approximately 16 months later. In the meantime, there was no indication that Krocka was experiencing side effects from the drug (which at the time of the blood test he had been taking for approximately 3 1/2 years). If Dr. Bransfield truly believed that Krocka's use of Prozac posed a threat to public safety or that a baseline measurement was necessary, he would not have waited so long to order the test.

The court finds clear support for its position that Dr. Bransfield did not order the test for legitimate safety concerns in defendant's own characterization of Dr. Bransfield's testimony: "it is evident from Bransfield's testimony ... that he did not suspect that plaintiff suffered serious psychiatric problems and ordered a Prozac blood level test to confirm his suspicions." Bransfield admitted that he ordered the test to see if plaintiff was actually taking Prozac, "that plaintiff had Prozac in his blood."[16] Bransfield has admitted that he ordered an employee to undergo a blood test and turn over the results simply to determine whether or not that employee was taking a legally prescribed medication. This was done despite plaintiff's having submitted medical documentation indicating that he indeed took Prozac, that his doctors were monitoring its use and that he was fit for duty. This admission destroys Bransfield's argument that he ordered the blood test for legitimate safety reasons. The City had absolutely no substantial interest in such a test, which had as

---

15. Although the CPD's Psychotropic Drug Policy required an officer to be removed from duty until his own doctor and a CPD-appointed psychologist deemed him fit, it did not require a test for an officer's Prozac blood level.

16. Defendant made this admission in its response to plaintiff's claim that the CPD regarded him as disabled, attempting to show that Dr. Bransfield so strongly believed that Krocka was not disabled that he did not even believe he was actually taking Prozac.

its purpose the satisfaction of Bransfield's suspicions. The court finds a state-ordered blood test that served no public interest is violative of the Fourth Amendment. *Skinner, Von Raab.*

### B. Qualified Immunity

■■■ Although the court addressed the issue at the motion to dismiss stage, Bransfield again claims that even if Krocka has established a claim for a violation of his Fourth Amendment rights, Bransfield is qualifiedly immune from liability. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* Krocka bears the burden of establishing that the constitutional or statutory right allegedly violated was clearly established at the time Bransfield acted. *Lawshe v. Simpson,* 16 F.3d 1475, 1483 (7th Cir.1994). Because the court noted at the motion to dismiss stage that Krocka did not point to any closely analogous cases, Dr. Bransfield insists that the right could not have been clearly established and that he is therefore entitled to immunity. The court does not find that "plaintiff failed to point to any case law in a closely analogous area," as defendant claims, rather it finds that no factually analogous case exists—for instance, one that involves testing for a legally prescribed medication. Nevertheless, the parties' numerous cites to cases discussing Fourth Amendment interests in the context of blood and urine tests indicates that a related body of law indeed exists. *Skinner, Von Raab; Wrightsell.* More important, those cases clearly and unequivocally define a right to be free from government-mandated blood tests unless a substantial government interest exists. Defendant is incorrect in stating that he violated no clearly established right.

■■■ To reiterate, government-mandated blood tests in an employment context clearly invoke the protections of the Fourth Amendment. *Skinner,* 489 U.S. at 616, 109 S.Ct. at 1413. Krocka's right not to submit to and turn over the results of a blood test was therefore specifically established in the case law Dr. Bransfield himself cites. These cases also clearly establish that to satisfy the reasonableness requirements of the Fourth Amendment when mandating blood tests, the City must have a "special need" that "justifies the privacy intrusions at issue absent a warrant or individualized suspicion." *Id.,* 489 U.S. at 621, 109 S.Ct. at 1415. Therefore, it is clear from the case law that ordering a blood test—even if conducted in the patient's own doctor's office—is permissible only in instances where the government can articulate "an important governmental interest furthered by the intrusion (that) would be placed in jeopardy by a requirement of individualized suspicion." *Skinner,* 489 U.S. at 624, 109 S.Ct. at 1417. *Benson v. Allphin,* 786 F.2d 268, 276 (7th Cir.), cert. denied, 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986) ("whenever a balancing of interests is required, the facts of the existing caselaw must closely correspond to the contested action before the defendant official is subject to liability"). As noted above, testing for illegal drugs or alcohol has been deemed reasonable for transportation workers or police and fire departments only because the tests furthered the government's substantial interest in safety. *Von Raab,* 489 U.S. at 676, 109 S.Ct. at 1396; *Skinner,* 489 U.S. at 628, 109 S.Ct. at 1419; *Wrightsell v. Chicago,* 678 F.Supp. 727, 733 (N.D.Ill.1988). Dr. Bransfield is aware of the need for a substantial government interest to justify the test as he has proffered one: the CPD's need for fit officers and its interest in safety.

■■■ Bransfield repeatedly analogizes the instant case to those involving drug tests, asserting that no reasonable official could have been aware that a test for a psychotropic medication would be treated any differently than a test for narcotics or alcohol. The flaw in this argument is that the court has found that Dr. Bransfield's purported legiti-

mate purpose for ordering the blood test is completely unsupported—and indeed contradicted—by the record. The cases certainly do not contemplate that the government interests would allow any type of exam or testing for any reason. *See Von Raab,* 489 U.S. at 672, 109 S.Ct. at 1394 (testing for illegal narcotics for customs employees who are directly involved in the interdiction of illegal drugs or who carry firearms); *Skinner,* 489 U.S. at 609–11, 109 S.Ct. at 1408–10 (tests for alcohol and illegal drugs for railway employees who are involved in accidents or who violate safety rules). As the court has already noted, there is no evidence that the baseline measurement would provide information that would further a legitimate CPD interest. Without a factual basis that a substantial government interest exists, a reasonable official should have known that the Fourth Amendment prohibited the blood test.

■ The court concludes that the law was sufficiently clear and the right sufficiently particularized that Bransfield should have known that ordering an individualized blood test to measure levels of a legally prescribed drug when no legitimate government interest existed was a clear violation of Krocka's Fourth Amendment rights of which a reasonable official should have known. *Colaizzi v. Walker,* 812 F.2d 304, 308 (7th Cir.1987) ("the test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted"). It declines to extend qualified immunity to the facts at issue. The court grants plaintiff's motion for summary judgment and denies Bransfield's motion for summary judgment as to Krocka's Fourth Amendment claim against Bransfield.

### C. Job Related and Consistent with Business Necessity

■ Krocka also challenges the blood test as a violation of the ADA. Under the ADA, an employer must show that a medical exam, including a blood test, was "job related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). The City asserts here, as under the § 1983 claim, that the test was justified by concerns that Prozac would impair Krocka's judgment. This argument fails. Bransfield's admission that the test told him only that there was Prozac in Krocka's blood is also an admission that it violated the ADA because the statute prohibits inquiring into the nature or severity of an employee's disability. 42 U.S.C. § 12112(d)(4)(A).

■ In addition, the City claims that the blood test was valid under the ADA because Bransfield did not think plaintiff had a disability and was attempting to prove his suspicion. It claims that the test was not intended to confirm that Krocka had a disability but rather that he did not have a disability. Defendant tries to distinguish the situation from a case where an ADA violation existed where the employer suspected an employee of being HIV-positive and searched his office for evidence that a disability *did* exist. *See Doe v. Kohn Nast & Graf, P.C.,* 866 F.Supp. 190 (E.D.Pa.1994). The distinction defendant makes misapprehends the law. The ADA bars employers from inquiring into the severity of a disability. 42 U.S.C. § 12112(d)(4)(A). When an employer orders a medical exam to determine how disabled—or not disabled—an employee is, he runs the risk of violating the ADA unless a legitimate, job-related reason for the exam exists.

Ironically, because the ADA protects only people with disabilities, medical exam results that indicated an employee did not have a disability would not violate the statute because the employee would not have standing to sue under the ADA. Summary judgment on the ADA count is therefore denied because a genuine issue of fact exists as to whether plaintiff has a disability.

ORDERED: The court grants defendant's motion for summary judgment and denies plaintiff's motion for summary judgment as to plaintiff's claim that the City perceived plaintiff as disabled by his depression. The court denies plaintiff's motion and defendant's motion on plaintiff's claim that his depression substantially limits a major life activity. The court grants defendant's motion as to plaintiff's claim that the City retaliated against him for filing an EEOC charge and as to plaintiff's claim that the City denied him a reasonable accommodation. It

denies defendant's motion for summary judgment as to whether placement in the Personnel Concerns Program constitutes an adverse action under the ADA.

As to plaintiff's § 1983 claim, the court denies defendant's motion for summary judgment and grants plaintiff's motion for summary judgment on the claim that the blood test Bransfield ordered violated plaintiff's Fourth Amendment rights. As to plaintiff's claim that the blood test violated his ADA rights, the court denies plaintiff's and defendant's motions for summary judgment.

Defendants' motion for summary judgment is granted in part and denied in part. Plaintiff's motion for summary judgment is granted in part and denied in part.